IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BERTRAM EMEKEKWUE,      :
        **Plaintiff**      :   **Civil No. 1:11-cv-01747**
              :
      **v.**      :
              :
**CHINWE OFFOR,**      :
              :   **Judge Sylvia H. Rambo**
        **Defendant**      :

## M E M O R A N D U M

Presently before the court is Defendant's motion for summary judgment pursuant to Federal Rule of Procedure 56. For the reasons that follow, the motion will be granted, and judgment will be entered in favor of Defendant.

## I.    Background

### A.    Procedural Background

Invoking the court's diversity jurisdiction,[1] Plaintiff, Bertram Emekekwue ("Plaintiff"), brought this action in response to statements made by Defendant, Chinwe Offor ("Defendant"), in a July 19, 2011 email. (Doc. 52, ¶¶ 13-14.) The email regarded the Obosi Community Association of New York Inc.'s[2] ("OCA") consideration of whether to provide financial benefits to Plaintiff's children following the death of his ex-wife, Vanessa Emekekwue. (Doc. 52, Ex. H, ¶¶ 12-

---

[1] Plaintiff is a resident of Pennsylvania (Doc. 8, ¶ 4), and Defendant is a resident of New York (*id*. at ¶ 5). The amount in controversy exceeds $75,000.00. (*Id*. at ¶ 1.)

[2] According to the OCA website, the "[OCA] was established in 1994 for the purpose of providing educational opportunities to boys and girls of Obosi, as well as improving the standard of living at Obosi. OCA's sources of funds are donations from individuals and corporations. OCA is a charitable organization with IRS tax exempt status. Its membership covers [the] New York, New Jersey, Connecticut[,] and Pennsylvania areas." Obosi Community Association of New York Area, Inc., http://obosinynj.org/ (last visited May 21, 2014).

13.)  Plaintiff's original complaint brought claims of libel, intentional infliction of emotional distress, negligent infliction of emotional distress, and punitive damages. (Doc. 1.)  On December 7, 2011, Defendant filed a motion to dismiss and brief in support, wherein she argued for dismissal of Plaintiff's complaint based on lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), as well as for failure to state a claim under Rule 12(b)(6).  (Docs. 5 & 6.)

Prior to the court's disposition of Defendant's motion to dismiss, Plaintiff filed, in accordance with Federal Rule of Civil Procedure 15(a)(1)(B), an amended complaint on December 16, 2011.  (Doc. 8.)  In response, Defendant filed an amended motion to dismiss on December 31, 2011.  (Doc. 12.) Defendant's amended motion to dismiss and brief in support thereof contained arguments for dismissal based solely on Plaintiff's failure to state a claim pursuant to Rule 12(b)(6).  Defendant did not re-raise, incorporate by reference, or otherwise mention the Rule 12(b)(2) personal jurisdiction argument in either the amended motion to dismiss or brief in support.  On May 15, 2012, the court granted Defendant's motion to dismiss pertaining to Plaintiff's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and punitive damages on the basis of Plaintiff's failure to state a claim, but denied the motion as it pertained to Plaintiff's defamation claim.  (Doc. 17.)  Noting that Defendant did not re-raise the personal jurisdiction argument, the court only addressed the arguments presented in the amended motion to dismiss.  (*Id*. at p. 4, n.4.)

Following the issuance of the court's memorandum and order granting in part and denying in part Defendant's motion to dismiss, Defendant filed an answer to the amended complaint on June 1, 2012.  (Doc. 18.)  On July 24, 2012, Defendant

filed a motion for summary judgment, raising the sole issue of personal jurisdiction. (Doc. 22.)  In a memorandum and order dated October 24, 2012, the court denied Defendant's motion for summary judgment, finding that Defendant's failure to renew the personal jurisdiction argument in her amended motion to dismiss waived any such defense pursuant to Federal Rule of Civil Procedure 12(g) and 12(h).  (Doc. 27.)

Following discovery, Defendant filed the instant motion for summary judgment on February 28, 2014.  (Doc. 51.)  The motion was accompanied by Defendant's statement of material facts (Doc. 52), brief in support (Doc. 53), and exhibits (Doc. 52, attachments 1-10).  Defendant argues that she is entitled to summary judgment because Plaintiff failed to produce sufficient material facts to support the elements of a defamation claim and because her statements were conditionally privileged, truthful, and/or constituted non-actionable expressions of opinion.  On March 21, 2014, Plaintiff filed his opposition to the motion for summary judgment (Doc. 54), brief in support thereof (Doc. 54-2), and response to Defendant's statement of facts (Doc. 52).  Defendant filed a reply brief on April 4, 2014.  (Doc. 56.)  The motion for summary judgment is therefore fully briefed and ripe for disposition.

## B.   **Factual Background**

Plaintiff and his wife, Vanessa Emekekwue ("Vanessa") were married and had three children.  Throughout their marriage, the couple was closely involved with the OCA.  In addition to regularly attending OCA meetings and events, Plaintiff

was a secretary of the organization[3] and Vanessa was a member of the scholarship committee. (B. Emekekwue Dep. at p. 36; *see* Doc. 54-14, p. 2 of 2.) In the spring of 2010, the couple divorced (Doc. 52, ¶ 3; Doc. 55, ¶ 3), and Plaintiff soon remarried (*see* Doc. 54-8, p. 2 of 2).

At some point during Plaintiff and Vanessa's marriage, Vanessa became ill and was being treated for cancer at Johns Hopkins Hospital. However, following their divorce, Plaintiff's employer terminated Vanessa's health insurance, ultimately resulting in her inability to continue receiving medical care at Johns Hopkins. (*See* Doc. 54, p. 4; B. Emekekwue Dep. at pp. 59-60.) She was referred to the Penn State Hershey Medical Center where she continued her treatment, but succumbed to her illness in 2011.

Upon the death of an OCA member, the OCA's Constitution and Bylaws (the "OCA Constitution") (*see* Doc. 54-7) provides for the distribution of a death benefit in the amount of $200.00 per child (*see id.* at p. 14 of 15). However, as Plaintiff admits, whether divorce operates to severe one's death benefits under the OCA Constitution is a "grey area." (*See* Doc. 54-2, p. 3 of 11; B. Emekekwue Dep. at pp. 55-56.) Due to this ambiguity, the president of the OCA, Anthony Obiajulu ("Mr. Obiajulu") sent an email to OCA executive members to inquire whether it was appropriate to pay death benefits to Vanessa's children given that the Emekekwues divorced in the year prior to Vanessa's death.[4] (Doc. 54-8; *see* Doc. 54-5, ¶ 6.) Mr. Obiajulu wrote, in pertinent part, as follows:

---

[3] Plaintiff was also a member and secretary of the Obosi Development Association, USA Inc. ("ODA"), the national Obosi organization. (B. Emekekwue Dep. at p. 36.)

[4] It is undisputed that Plaintiff paid annual family dues in the amount of $100 in 2011. (Doc. 54-5, ¶ 5; C. Offor Dep. at pp. 46-47.)

I make this proposal for your thoughtful consideration and response.

A fair interpretation of OCA bylaws is that a family membership has two components or requirements, namely, payment of family membership dues AND currently married husband and wife status.  Children that are minors[, *i.e.*,] under 21, are deemed to be member's children, with no independent standing or obligations or rights. . . .

Bertram Emekekwue was married to Vanessa for years during which they had three children; during this period, Betram paid family membership dues.  Then Vanessa divorced Bertram . . . and Bertram officially notified OCA.  Subsequently, Bertram became engaged and later married.  Before their divorce Bertram and Vanessa informed OCA that she had been diagnosed with cancer; and last week she succumbed to cancer and died; on the date of Vanessa's death, Bertram had remarried.

Based on [the] above interpretation, Bertram would not be entitled to receive bereavement payment from OCA for the death of Vanessa because he no longer was husband to Vanessa on the date of her death.

Now, that having been said, and regardless of what views one holds of Bertram, positive or negative, my concern is that in good conscience we do what is right and fair, specifically, with regard to the three children Vanessa had with Bertram during their marriage and membership of OCA.  Simply put, the children of our current member (Bertram) and our former late member (Vanessa) have lost their mother, Vanessa – who while a member and still alive was a regular and familiar presence at OCA meetings and events.  Therefore, just as a member who loses a relative receives a $200 condolence payment, I propose that OCA make a condolence payment of $200 to each of the three children who have lost their mother.

I need the yes or no vote of each exec member on this proposal asap.  Even if the majority approves my proposal, I think it would still be appropriate to submit it for ratification to the general membership at our next meeting (with proper procedure to safeguard the sensitivity of the matter) both because of the novelty of the case and the amount of money involved.

(Doc. 54-8.)[5]

> The treasurer of the OCA forwarded Mr. Obiajulu's email to Defendant (C. Offor Dep. at p. 27), and, in response, Defendant authored the email at issue in this case and sent it to both executive and non-executive members of the OCA[6] (Doc. 54-5, ¶ 16; B. Emekewue Dep. at pp. 71-72). Defendant asserts that she was uniquely qualified to offer her opinions with regard to whether Vanessa's children should receive death benefits because, as past president of the OCA, she was intimately familiar with the constitution, bylaws, and operating procedures of the organization. (Doc. 53, p. 18; *see* C. Offor Dep. at pp. 56-57; Doc. 52-4, ¶ 8.) The challenged email follows in its entirety:

---

[5] The court notes that the email contained in the record is the second publication of the substance of this email. By way of explanation, during her deposition, Defendant explained the discrepancy between the time stamps contained in her email, *i.e.*, the email at issue in this case (time stamped July 19, 2011 at 5:38 p.m.) (*see* Doc. 54-6), which was sent in response to Mr. Obiajulu's email (time stamped July 19, 2011 at 8:08 p.m.) (*see* Doc. 54-8). Specifically, Defendant explained that Mr. Obiajulu's email was circulated previously and that the email in exhibit (Doc. 54-8) was Mr. Obiajulu's follow up email requesting opinions from members who had not yet responded to his first request. ©. Offor Dep. at pp. 80-81; *see* Doc. 54-8 ("PS: I thank those who have voted on the proposal and ask those that have not to do so, and I would announce the result.").).

[6] Defendant's email was addressed to the entire OCA membership body through the organization's official group email list rather than to just the executive board. (Doc. 56, p. 8 n.2.) Plaintiff repeatedly alleges that, following Defendant's initial publication to OCA members, the email was circulated worldwide to non-members of the OCA. (*See* Doc. 8, ¶¶ 6, 11-12; Doc. 55, ¶¶ 16, 18; Doc. 54-2, pp. 1, 6, 8.) However, the only factual support cited by Plaintiff for this alleged worldwide distribution is Plaintiff's own deposition testimony that actually undermines his claim. When asked by Defense counsel "of whom do you have knowledge that the email was forwarded to other than the people located in the original mailing list," Plaintiff responded that the email was forwarded to his brother and sister, but then explained that he was the one who actually forwarded it to them. (B. Emekekwue Dep. at pp. 74-75.) Such facts do not support expanding the scope of the recipients in this case and thus the court will only consider the original recipients of the email, *i.e.*, OCA members, for purposes of its analysis. *See* 42 Pa. Con. Stat. § 8343(2) (requiring proof of publication by the defendant); *Williams v. Univ. of the Sciences in Phila.*, 2004 WL 2399735, Civ. No. 02-cv-7085, *5 (E.D. Pa. Sept. 30, 2004) (stating that the burden of proving publication is on the plaintiff).

Obosi dalu nnu,

It has come to my attention that our President is seeking opinions on whether we can disregard our constitution and give money to late Vanessa Emekewue's children which in effect means we are giving money to Mr[.] Bertram Emekekwue since these children are all minors.

Our constitution allows us to give money to a spouse or even children of an active member.

However, Mr[.] Bertram Emekekwue is an ex-spouse and does not qualify for any money under our constitution.

Also at the time of Vanessa's death, she had never indicated any interest in continuing her membership despite their divorce nor was she a financial member hence her children do not also get any money officially from the organization (OCA).  I truly do not understand why this deserves a discussion.  The constitution is very clear on this issue.

However, Vanessa actively participated in OCA and was much loved by us all.  I suggest if it's possible for all of us to personally donate to a fund that will be given to her very, very dear children when they are ready for college or 18 [years] of age.

I implore our very learned President who also happens to be a lawyer to remember that he should guard our constitution jealously.  He was instrumental in the drafting of that constitution and our constitution should be our guideline and highly respected as obtains in other civilized organizations.

In conclusion, let's call a spade a spade.  Mr[.] Bertram Emekekwue took away Vanessa's medical insurance which would have enabled her to continue her medical treatment at Johns Hopkins University where they were familiar with her cancer.  She had no choice but to go to the State hospital in Pennsylvania.  He was very proud of this and had no problems informing all and sundry how she would soon die.  It's pathetic that he wants to gain financially from her death.  Please stop begging OCA and ODA to pay for your ex-wife's death.  ENOUGH ALREADY.

Thanks.
Chinwe Offor (onwelego)

(Doc. 54-6.)

Plaintiff argues that Defendant's email was libelous in that it contained a series of false statements and harmed Plaintiff's reputation. Specifically, Plaintiff claims that Defendant falsely stated (1) that Plaintiff sought death benefits from the OCA (Doc. 54-2, p. 1); (2) that Plaintiff was responsible for Vanessa's death because he cancelled her health insurance policy (*id*. at pp. 1-2); (3) that Plaintiff bragged about Vanessa's imminent death (*id*. at p. 2); and (4) that Plaintiff wanted to gain financially from his ex-wife's death (*id*.). Plaintiff alleges that, as a result of the email, he was impeached from his position as secretary of the OCA and ODA and ostracized from the Obosi community. (*Id*. at pp. 7-8.)

In her motion for summary judgment, Defendant offers factual support for her affirmative defenses of truth, opinion, and conditional privilege, and addresses the absence of material evidence to support Plaintiff's cause of action for libel. More specifically, Defendant offers evidence demonstrating, *inter alia*, (1) that Plaintiff requested death benefits from both the ODA and OCA (*see* Doc. 52-6, ¶ 8; Doc. 52-5, ¶ 8; *see also* C. Offor Dep. at pp. 62-64); (2) that Vanessa did not continue her membership with the OCA following the Emekekwue's divorce (K. Offor Dep. at p. 16; C. Offor Dep. at pp. 24-25); (3) that Plaintiff discussed the circumstances of his divorce with fellow OCA members (*see* Doc. 52-4, ¶¶ 5-6; Doc. 52-5, ¶¶ 6-7); (4) that Plaintiff told several OCA members that he had "cancelled" Vanessa's medical insurance (*see* Doc. 52-6, ¶ 6; Doc. 52-5, ¶¶ 6-7; K. Offor Dep. at p. 18); (5) that Plaintiff stated that Vanessa "can die for all I care" and called her a "villain" (*see* Doc. 52-5, ¶ 6; 52-4, ¶ 5); (6) that OCA members did not change their opinion of Plaintiff due to Defendant's email (*see* K. Offor Dep. at pp. 10-11; Doc.

52-4, ¶ 4; Doc. 52-5; ¶ 5; Doc. 52-6, ¶ 5); and (7) that Plaintiff's inappropriate behavior and failure to carry out his duties as secretary of the OCA and ODA led to his impeachment and removal from the executive office.[7] (Doc. 53, p. 16; *see* Doc. 52-9; Doc. 52-5, ¶ 10; Doc. 52-6, ¶ 10).

In response, Plaintiff adamantly argues that Defendant's statements were false, taking exception with literally every statement contained in the email. (*See* B. Emekekwue Dep. at pp. 44-45 ("Everything [Defendant] wrote about me in the email are [sic] not true."); Doc. 54-2.)  However, Plaintiff fails to support his position with virtually any evidence beyond his own uncorroborated statements and fails to set out specific material facts to support the required elements of his libel claim.  Thus, after a thorough review of the record taken as a whole, the court finds that the statements contained in the email forming the basis of Plaintiff's libel claim

---

[7] In a letter notifying Plaintiff of his impeachment, Mr. Obiajulu wrote as follows:

During the [December 17, 2011 meeting of the OCA,] a motion was moved and properly seconded to impeach and remove you as the OCA secretary. . . .  The reasons for the motion to impeach you include as follows: (1) written threat and intimidation of all Obosi indigenes and non-indigenes including OCA members through an email you authored and sent on November 27, 2011; (2) on November 24, 2011 you notified OCA members that you were forwarding an unapproved and un-adopted minute of OCA general meeting held on October 29, 2011 to individuals, entities and agencies not affiliated with OCA and without the prior consent of OCA; (3) on November 24, 2011 you notified OCA members that you were forwarding an unapproved OCA document(s) without the prior consent of OCA; (4) on November 24, 2011 you distributed disparaging communications detrimental to the integrity and reputation of OCA and OCA members to individuals, entities and agencies not affiliated with OCA, and on (5) December 11, 2011 you resigned as Secretary of national body [ODA] upon overwhelming vote by ODA executives to impeach and remove you as ODA Secretary thus rendering you unfit to continue as the OCA Secretary.

(Doc. 52-10, p. 1.)  Significantly, the impeachment letter does not mention Defendant's email or any of the issues addressed therein.

were not capable of a defamatory meaning.  Moreover, the court concludes that the statements were either substantially true or constituted non-actionable opinion, or were otherwise privileged.  Therefore, the court will grant Defendant's motion for summary judgment.

## II.        <u>Legal Standard</u>

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  For a factual dispute to be genuine, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims.  *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *See, e.g.*, Fed. R. Civ.

P. 56(e).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In this situation, the moving party is entitled to judgment as a matter of law. *Id.*  Notably, "[s]elf serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Brooks v. Kerry*, Civ. No. 10-0646, 2014 WL 1285948, *8, — F. Supp. 2d — (D.D.C. Mar. 31, 2014) (quoting *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007)).  As the district court in *Brooks* explained:

> "Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury,". . . "is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  Particularly in a case . . . where the non-moving party relies almost entirely upon [his] own generally uncorroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess whether the plaintiff's evidence is "merely colorable," *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505, or whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* at 248, 106 S.Ct. 2505.  The Court must review the record "taken as a whole." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  On the one hand, the Court must accept all of the non-movant's evidence as true and give [him] the benefit of all justifiable inferences. *See id.* at 255, 106 S.Ct. 2505.  The Court may not make credibility determinations or weigh the evidence, *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Liberty Lobby*, 477 U.S. at 255, 106

S.Ct. 2505).  On the other hand, a non-movant's allegations that are "generalized, conclusory and uncorroborated by any evidence other than the [non-movant's] own deposition testimony" are "insufficient to establish a triable issue of fact" – at least where the nature of the purported factual dispute reasonably suggests that corroborating evidence should be available.  *See Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 183 (D.D.C. 2010); *see also GE v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage").

*Brooks*,  2014 WL 1285948 at *8.

## III.    Discussion

At issue in this case is the viability of Plaintiff's claim for libel. Defendant argues that she is entitled to judgment as a matter of law because Plaintiff cannot establish all of the necessary elements to establish such a claim and because her statements were privileged, substantially true, and/or constituted non-actionable expressions of opinion.  Plaintiff responds that Defendant's email was defamatory and resulted in significant harm to his reputation.

### A.    Defamation

To succeed on his claim for libel, Plaintiff must establish that the challenged publication was defamatory.  *Thomas Merton Cntr. v. Rockwell Intern. Corp.*, 442 A.2d 213, 215 (Pa. 1981); *see Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008) ("Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements.")  In Pennsylvania, the burden of proof for a common law defamation action is set forth by statute:

(a)     Burden of plaintiff. – In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1)     The defamatory character of the communication.

(2)     Its publication by the defendant.

(3)     Its application to the plaintiff.

(4)     The understanding by the recipient of its defamatory meaning.

(5)     The understanding by the recipient of it as intended to be applied to the plaintiff.

(6)     Special harm resulting to the plaintiff from its publication.

(7)     Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a); *Porter v. Joy Realty, Inc.*, 872 A.2d 846, 849 (Pa. Super. Ct. 2005). The court finds that Plaintiff has failed to provide evidence sufficient to establish the defamatory character of the communication.[8]

Whether the challenged communication is capable of bearing the defamatory meaning ascribed to it by the plaintiff is a question for the court. *Smith v. IMG Worldwide, Inc.*, 437 F. Supp. 2d 297, 307 (E.D. Pa. 2006); *Tucker v.*

---

[8]  In addition, the court finds that Plaintiff failed to establish the understanding by the recipients of the communication's defamatory meaning, special harm resulting from the communication's publication, and abuse of a conditionally privileged occasion. As for the remaining elements, Defendant does not dispute that the email was published, intended to apply to Plaintiff, and understood by the recipients as intended to apply to Plaintiff. (Doc. 53, p. 10.) Because failure to succeed on one element is fatal to the claim, the court will only specifically address the defamatory character of the communication. Moreover, the court is confident that its discussion pertaining to the defamatory character of the communication, which also inherently addresses the understanding by the recipients and special harm resulting from its publication, is sufficient. The court will discuss conditional privilege in a later section of this memorandum.

13

*Philadelphia Daily News*, 848 A.2d 113, 123-24 (Pa. 2004).  To determine whether a communication is capable of a defamatory meaning, the court must consider whether it "tends to harm an individual's reputation so as to lower him in the estimation of the community or [to] deter third persons from associating or dealing with him." *U.S. Healthcare v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990) (citing *Birl v. Philadelphia Elec. Co.*, 167 A.2d 472, 476 (Pa. 1960)).  In reaching its conclusion, the court must view the statements in context and determine whether the communication seems "to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession."  *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987) (internal citations omitted); *Green v. Minzer*, 692 A.2d 169, 172 (Pa. Super. Ct. 1997).  In this regard, the court should "determine the effect the [communication] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate."  *Baker*, 532 A.2d at 402; *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216 (Pa. 1981).  It therefore follows that, in doing so, the court must consider the nature of the audience receiving the remarks. *Baker*, 532 A.2d at 402.

Moreover, certain types of communications, while undoubtably offensive or distasteful, do not rise to the level of defamation because the law does not extend to mere insult.  *See Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999); *Kryeski v. Schott Glass Tech., Inc.*, 626 A.2d 595, 600-601 (Pa. Super. Ct. 1993).  For example, expressions of opinion, without more, are not actionable. *Id*.  Likewise, "[s]tatements which are merely annoying or embarrassing or [are] no more than rhetorical hyperbole or a vigorous epithet are not defamatory." *Beverly*

*Enters.*, 182 F.3d at 187 (quoting *Kryeski*, 626 A.2d at 601).  Rather, the plaintiff "must have suffered the kind of harm which has grievously fractured his standing in the community . . . ." *Tucker*, 848 A.2d at 124.

Applying these well established legal principles to the present case, the court finds that the challenged email was incapable of a defamatory meaning.  In this case, the entire controversy centers on the interpretation of Defendant's email, particularly the last paragraph of the email.  In evaluating the nature of this communication, the court first notes that Defendant sent the email to OCA members during an internal deliberation concerning whether to pay death benefits to Plaintiff's children.  As highlighted by both Plaintiff and Defendant, the OCA is comprised of a tight-knit group of members who are generally aware of other members' life circumstances and situations.  (*See* Doc. 53, p. 12; Doc. 54-2, p. 6.)  Thus, the court must determine the impression the email would naturally engender in the minds of these intended recipients given the nature of their community.

When viewed in this context, Plaintiff has not met his burden in establishing the defamatory character of the email.  Significantly, Plaintiff has failed to set forth legally sufficient evidence showing that his reputation or standing in the community suffered in any way as a result of the email.  Notably absent here is a statement from a single member of the community, aside from Plaintiff and his current wife, demonstrating that Defendant's email grievously fractured Plaintiff's reputation in the community or even affected his reputation at all, despite the fact that such corroborating evidence should be readily available.  Instead, the only OCA recipients on record in this dispute testified that the email did not change their opinion of Plaintiff, cause them to think less of him, or deter them from associating

15

with him.[9]  (Doc. 52-4, ¶ 4; Doc. 52-5, ¶ 5; Doc. 52-6, ¶ 5.)  Moreover, Plaintiff

failed to rebut Defendant's claim that Plaintiff's own actions, rather than the

statements made by Defendant, led to his removal from office and alleged

ostracization from the Obosi community.  (*See* Doc. 53, p. 16; Doc. 52-9; Doc. 52-

10.)  Indeed, Plaintiff neglected to address the allegations detailed in the

impeachment letters or to attack their validity, and thus, Defendant's position that it

was Plaintiff's own hostile, inappropriate, and abusive behavior which led to his

ousting stands unrefuted.[10]  Consequently, Plaintiff's conclusory and generalized

allegations that his reputation was harmed as a result of Defendant's email are not

enough to establish a triable issue of fact.  *See Akridge,* 729 F. Supp. at 183.

Furthermore, Plaintiff's proposed defamatory construction of the email

must be rejected because it is not supported by the record and requires unreasonable

inferences.  *See Thomas Merton,* 442 A.2d at 216-17 (finding that the subject

statements were not defamatory as a matter of law because the plaintiff's

construction was based on an unreasonable inference).  Plaintiff has consistently

taken the position that Defendant "indirectly call[ed] Plaintiff a murderer and

---

[9] Plaintiff urges the court to discredit the declarations submitted by Defendant in support of her motion for summary judgment.  (*See, e.g.*, Doc. 54-2, p. 4.)  As stated, the court cannot weigh credibility at the motion for summary judgment stage.  However, on a record such as the one present here, where Plaintiff's unsupported allegation of what is properly characterized as perjury is the only bases on which he urges the court to discredit these declarations, the court will consider the declarations.

[10] In his answer to Defendant's statement of material facts, Plaintiff states that he was impeached in retaliation for filing this lawsuit and that he was never reprimanded for failing to properly execute his duties as secretary or for any inappropriate behavior.  (*See* Doc. 55, ¶ 23.)  In support of his claim, Plaintiff cites to an appreciation plaque that he received for his work as secretary from 2008-2011.  This evidence, without more, falls far short from attacking the validity of the accusations contained in the impeachment letters (*see* Doc. 52-10; Doc. 52-9) and the declarations submitted by Defendant in support of her motion (*see* Doc. 52-5, ¶ 10; Doc. 52-6, ¶ 10).

extortionist . . . ."[11]  (Doc. 54-2, p. 10.)  Arguably, if the last paragraph of the email constituted the entire record, the innuendo urged by Plaintiff might be more reasonable.  However, "words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable." *Thomas Merton*, 442 A.2d at 465 (quoting Restatement (Second) of Torts s 559 (1977)).  Such is the case here.  The OCA members were aware that Vanessa died from cancer despite receiving treatment at Johns Hopkins and later Hershey Medical Center.  (*See*, *e.g.*, Doc. 54-8.)  Indeed, Defendant's email specifically stated that Vanessa received ongoing treatment despite the change in her medical insurance.  (*See* Doc. 54-6.)  In addition, while Defendant wrote that Plaintiff was "begging [the] OCA and ODA to pay [him] for [Vanessa's] death" (*id.*), such a statement does not insinuate that Plaintiff attempted to "extort" money from the OCA or ODA.  The words "beg" and "extort" have vastly different meanings.  "Extort" is defined by the Cambridge Dictionary of American English as "to obtain by force or threat," whereas "beg" is defined as "to ask for money, or to ask someone to do something in an urgent way."  Cambridge Dictionaries Online, http://dictionary.cambridge.org/.  Interpreting Defendant's email as alleging that Plaintiff attempted to do something illicit is unreasonable and

---

[11]  In his amended complaint, Plaintiff averred as follows:

> The statements contained in the e-mail were false in that Plaintiff was not the cause of his ex-wife's death and he did not extort nor attempt to extort the members of the OCA's Members [sic] for monetary compensation as insinuated and deduced from the Defendant's e-mail, which was intended to cause harm and ill thoughts of Plaintiff, by Defendant calling "a spade a spade."

(Doc. 8, ¶ 7.)  Plaintiff also made similar statements in his opposition to the motion to dismiss (*see* Doc. 14, pp. 3-4) and answers to Defendant's statement of undisputed facts (*see* Doc. 55, ¶ 13).

contradicted by the plain meaning of Defendant's use of the word "beg."  Further, Plaintiff's interpretation of Defendant's statement as insinuating that he was attempting to extort the organizations is contradicted by Defendant's suggestion that the OCA collect voluntary contributions to go toward a fund for Plaintiff's children. Ultimately, the email cannot be rendered libelous "by an innuendo which puts an unfair and forced construction on the interpretation of the publication.  An innuendo must be warranted, justified and supported by the publication." *Thomas Merton*, 442 A.2d at 217 (internal citations omitted).  Because it is "unfair and forced" to infer from the email that Defendant implied Plaintiff was a murder and extortionist, the court concludes that Defendant's statements were not defamatory.

Finally, Plaintiff argues that Defendant's use of the phrase, "let's call a spade a spade" clearly illustrates the defamatory character of the email.  (*See*, *e.g.*, Doc. 55, ¶ 13 ("Defendant's email was intended to cause harm and ill thoughts of Plaintiff (which it did), by Defendant stating 'let's call a spade a spade.'").)  The definition of this idiom, as provided by Plaintiff and taken from the Cambridge Idioms Dictionary, Second Edition, reads as follows: "to tell the truth about something, even if it is not polite or pleasant." (Doc. 54-2, p. 5.)  To tell the truth about something or someone, even if it offensive or distasteful, is not defamatory as a matter of law.  Thus, Defendant's use of this idiom to indicate that she was going to tell the truth does not rise to the level of defamation, even if her statements thereafter were distasteful or offensive to Plaintiff.  *See Beverly*, 182 F.3d at 187.

For all these reasons, the court finds that the statements contained in Defendant's email are incapable of a defamatory meaning and, therefore, no basis exists to proceed to trial.  *See Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 480 (E.D.

Pa. 2010) (stating that the court acts as a gatekeeper to determine whether the statements are incapable of a defamatory meaning in deciding whether any basis exists to proceed to trial).  Accordingly, Defendant's motion for summary judgment will be granted on the basis of Plaintiff's failure to produce sufficient evidence to support his claim.

### B.   Affirmative Defenses

Assuming, *arguendo*, that Plaintiff had met his burden of establishing a prima facie case of libel, Defendant is still entitled to summary judgment on the affirmative defenses of truth, opinion, and conditional privilege.

### 1.   Truth and Opinion

Plaintiff's position that all of the statements contained in Defendant's email are false (*see*, *e.g*., B. Emekekwue Dep. at pp. 44-45; Doc. 54-2) is not factually supportable.  Rather, the vast majority of the email contains statements of fact that, at a minimum, are substantially true, and the remainder of the email offers Defendant's opinions based on disclosed facts.  Thus, Defendant's statements are not actionable.

Pennsylvania law provides that truth is an absolute and complete defense to a defamation claim.  *Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) (citing *Bobb v. Kraybill*, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986)).  The burden is on the defendant to prove the truth of the defamatory communication.  42 Pa. Con. Stat. § 8343(b)(1).  The defendant can meet this burden if she proves the statements to be substantially true.  *Tucker v. Merck & Co., Inc.*, 102 F. App'x 247, 253 (3d Cir. 2004) (citing *Chicarella v. Passant*, 494 A.2d 1109, 1115 n.5 (Pa. Super. Ct. 1985)).  "Pennsylvania has determined proof of substantial truth must go to the 'gist' or

'sting' of the alleged defamatory matter." *Keeshan v. The Home Depot, U.S.A., Inc.*, Civ. No. 00-529, 2001 WL 310601, *15 (E.D. Pa. Mar. 27, 2001) (quoting *Gilbert v. Bionetics Corp.*, Civ. No. 98-2668, 2000 WL 807015, *3 (E.D. Pa. June 6, 2000)). "The test is whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982) (internal quotations omitted).  Thus, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. Dist. Ct. App. 1936)).

In response to the subject matter of the email, *i.e.*, whether to provide death benefits to his children, Plaintiff argues that he never requested nor was given death benefits following Vanessa's death.  (*See* B. Emekekwue Dep. at p. 48; Doc. 55, ¶¶ 10-12.)  Rather, Plaintiff maintains that Mr. Obiajulu, upon his own initiative, sent an email to the OCA executive members to inquire whether it would be appropriate to provide death benefits to the children.  (*See* Doc. 54-2, pp. 1-2; Doc. 55, ¶ 12.)  However, contrary to Plaintiff's uncorroborated assertion, John Uyamadu, the financial secretary of the OCA and vice president of the ODA, stated in his declaration that Plaintiff "made repeated requests to the ODA for benefits on behalf of himself and his children" (Doc. 52-5, ¶ 8), and Emeka Ubakanma, the treasurer of the OCA and a member of the ODA, stated that Plaintiff "made repeated requests to the ODA and OCA for death benefits on behalf of himself and his children . . . ." (Doc. 52-6, ¶ 7.)  Thus, the substance of Defendant's statements were true.

Moreover, even if Mr. Obiajulu made the requests on Plaintiff's behalf, requests were still made, and, therefore, Defendant's statements were substantially true.

In addition to objecting to the subject matter of Defendant's email, Plaintiff also takes exception with each paragraph contained therein. Plaintiff's objections regarding the first paragraph of the email are less than clear (*see* Doc. 54-2, p. 3), but again seem to pertain to the allegedly false premise that Plaintiff was seeking money from the OCA. (B. Emekekwue Dep. at p. 48 ("[I]t is not true because nobody is giving me money. This was a conclusive paragraph that in effects [sic] the money was given to Bertram Emekekwue. It is not true.").) In the first paragraph, Defendant explains the circumstances under which she is offering her opinion and frames the issue. (*See* Doc. 54-6 ("It has come to my attention that our President is seeking opinions on whether we can disregard our constitution and give money to late Vanessa Emekekwue's children which in effect means we are giving money to Bertram Emekekwue since these children are all minors.").) The facts as stated, that Vanessa is deceased, that her children are minors, and that Plaintiff would have control of any funds paid to the children, are not disputed.

Next, Plaintiff objects to Defendant's interpretation of the constitution, as provided in the next few paragraphs. However, Defendant's interpretation is merely her opinion. As Plaintiff readily admits, whether the OCA should pay death benefits to Vanessa's children given the Emekekwue's divorce fell into a "grey area" in the constitution. (*See* Doc. 54-2, p. 3.) Therefore, Defendant's interpretation of that "grey area" cannot be false.

The crux of Plaintiff's libel claim focuses on the final paragraph of Defendant's email. First, Plaintiff argues that Defendant's statement that he "took

away Vanessa's medical insurance" (Doc. 54-6) is blatantly false, explaining that Vanessa's health insurance was terminated by his employer following the couple's divorce.  (Doc. 54-2, p. 4.)  While Plaintiff's statement may have inferred that Plaintiff deliberately cancelled Vanessa's insurance, the statement is substantially true.  The Emekekwue's divorce did, in fact, result in Vanessa's insurance being taken away, even if Plaintiff did not elect to cancel it.  Moreover, according to two OCA members, Plaintiff made the outright claim that he had cancelled Vanessa's medical insurance.  (*See* Doc. 52-5 ("[Plaintiff] informed me that he had cancelled his wife Vanessa's insurance and explained that she would soon die from cancer."); Doc. 52-6 ("I witnessed [Plaintiff] bragging about the fact that he cancelled his wife Vanessa's medical insurance.").)

Likewise, the subsequent statements, wherein Defendant wrote that Vanessa was unable to continue her treatment at Johns Hopkins due to the cancellation of her insurance and had to go to the "State Hospital in Pennsylvania" (*see* Doc. 54-6), were substantially true.  Indeed, Plaintiff himself admits that the cancellation of Vanessa's insurance prevented her from continuing her treatment at Johns Hopkins and required her to go to Hershey Medical Center.  (*See* Emekekwue Dep. at pp. 65-66 ("Then she was actually referred to Hershey Medical Center, Pennsylvania State University Medical Hospital, because of the insurance that she doesn't have at Johns Hopkins.").)

The statements contained in the next sentence, that Plaintiff was proud of taking away Vanessa's medical insurance and "had no problems informing all and sundry how she would soon die," were also substantially true.  Although Plaintiff claims that he never made any such statements, two OCA members provided sworn

22

declarations stating that Plaintiff said "[Vanessa] can die for all I care" and called her a "villain." (Doc. 52-5, ¶ 6; Doc. 52-4, ¶¶ 5-6.) Thus, even if Defendant's statement was not entirely accurate, the "gist" of it was true.

Finally, Plaintiff argues that Defendant's opinions as provided in the last three sentences of the email were defamatory. In Pennsylvania, a defamatory communication in the form of an opinion is only actionable if it "may reasonably be understood to imply the existence of *undisclosed defamatory facts* justifying the opinion." *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (emphasis in original); *Balleta v. Spadoni*, 47 A.3d 183, 197 (Pa. Commw. Ct. 2012). As the Third Circuit has explained:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion. In such circumstances, if the underlying facts are false, the Constitution does not protect the opinion. *See* Restatement (Second) of Torts § 556A.

*Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985). Here, Defendant's stated opinions, *i.e.*, that it was "pathetic that [Plaintiff] want[ed] to gain financially from [Vanessa's] death, " and that Plaintiff should "stop begging OCA and ODA to pay you," constituted non-actionable expressions of opinion.

The first four paragraphs of Defendant's email provided the factual circumstances upon which Defendant based her opinions, *i.e.*, the membership status of the parties and the constitution, and, in the final paragraph, Defendant stated that Plaintiff was seeking benefits from the OCA. As discussed above, these facts were

substantially true.  Furthermore, the recipients of the email were intimately aware of the facts and circumstances underlying the statements made in this email.  Thus, the email recipients could choose to accept or reject Defendant's opinions based on the disclosed facts and, therefore, Defendant's statements are not actionable.

For all these reasons, Defendant has met her burden in proving that the statements contained in her email were substantially true or constituted non-actionable expressions of opinion.  As Plaintiff has not provided any competent evidence to overcome Defendant's showing, Defendant is entitled to summary judgment on these grounds.

### 3.    Conditional Privilege

Finally, even if the court had found that the communication was capable of a defamatory meaning or that Defendant was not entitled to the affirmative defenses of truth or opinion, the publication was made on a conditionally privileged occasion, thus relieving Defendant of any liability.

Conditional privilege serves as an affirmative defense to defamation claims under Pennsylvania law.  42 Pa. Con. Stat. § 8343(b)(2).  Thus, a properly stated defense of conditional privilege will relieve a defendant of liability even where the court concludes that a communication is capable of a defamatory meaning. *Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996).  Communications are privileged when they are "made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause . . . ." *Choi v. Sohn*, Civ. No. 01-1782, 2004 WL 627060, *3 (E.D. Pa. Mar. 1, 2004) (quoting *Davis v. Resources for Human Dev*., 770 A.2d 353, 358 (Pa. Super. Ct. 2001)).  Stated differently, a conditional privilege arises "whenever circumstances are such as to lead any one of

several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." *Merck*, 102 F. App'x at 253-54 (internal quotations and citations omitted).

In this case, Defendant and the other members of the OCA had a common interest in whether the OCA should pay death benefits to Plaintiff's children because the issue involved a novel question pertaining to a "grey area" of the constitution and potentially involved a significant amount of the organization's funds. (*See*, *e.g.*, Doc. 54-8 ("Even if the majority approves my proposal, I think it would still be appropriate to submit it for ratification to the general membership at our next meeting (with proper procedure to safeguard the sensitivity of the matter) both because of the novelty of the case and the amount of money involved.").) Defendant was uniquely qualified to offer her opinion on the matter because she is a past president of the OCA and is intimately familiar with the constitution, bylaws, and operating procedures of the organization.[12]  (*Id.*; *see* Doc. 52-5, ¶ 2.) Defendant's intent and purpose in authoring and sending the email was to inform other members about the issue, to ensure that the decision was made by the entire membership and not by a select group, to ensure that payments were not made in violation of the OCA constitution, and to offer her suggestion that OCA members voluntarily contribute money for a fund to give to the children.  (C. Offor Dep. at pp. 57-58.)  The court is persuaded that the circumstances "correctly or reasonably"

---

[12]  Plaintiff's position that "Defendant is neither a patron nor an executive member of the OCA" and, therefore, is not entitled to conditional privilege (Doc. 54-2, p. 8) is misguided because Defendant's privilege is grounded in her membership alone. *See Rankin*, 211 A.2d at p. 31 (extending conditional privilege "to the members of the [church], all of whom had a very real interest in the resolution of the problems which had involved the handling of the church's affairs").

caused Defendant to believe that facts existed which the members of the OCA were entitled to know, and, therefore, it finds that Defendant's email was a conditionally privileged communication.

Once a matter is deemed conditionally privileged, the burden shifts to the plaintiff to prove that the defendant abused the conditional privilege. *Howard v. Deklinski*, Civ. No. 01-4171, 2002 WL 31501850, *1 (3d Cir. 2002); *Choi*, 2004 WL 627060 at *3 (citing *Davis*, 770 A.2d at 359). An abuse occurs "when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose." *Beckman v. Dunn*, 419 A.2d 583, 588 (Pa. Super. 1980); *Tucker* at 254 (citing *Elia v. Erie Ins. Exch.*, 634 A.2d 657, 661 (Pa. Super. Ct. 1993)). "[A] private figure defamation plaintiff, seeking compensation for harm inflicted as a result of the publication of defamatory matter, must prove that the defamatory matter was published with want of reasonable care and diligence to ascertain the truth or, in the vernacular, with negligence." *Rutt v. Bethlehems' Globe Pub. Co.*, 484 A.2d 72, 83 (Pa. Super. Ct. 1984) (internal citations omitted).

Plaintiff has failed to demonstrate facts which would support a finding that the publication was a result of negligence or improper purpose. As the court has already found that Defendant's statements were substantially true or constituted legally protected opinion, Defendant cannot be liable for failure to exercise reasonable care and diligence to ascertain the truth. Nevertheless, even assuming Plaintiff had properly established his prima facie case and Defendant was not entitled

to the affirmative defenses of truth and opinion, Plaintiff has failed to offer any material facts to show that the purpose, scope, or subject matter of Defendant's statements were improper.  Defendant disseminated the email to OCA members who undoubtably shared her interest in the finances and constitution of the organization. While some of the statements in the email, particularly those in the last paragraph, revealed Defendant's personal opinions of Plaintiff and were, at times, arguably distasteful and insulting, the issues involved reasonably permitted Defendant to go beyond a simple interpretation of the constitution and discuss Plaintiff personally. Mr. Obiajulu's email indicated that the board was considering awarding a discretionary payment to Plaintiff despite the apparent constitutional restrictions.  It was therefore reasonable for Defendant, in order to protect the finances and ideals of the OCA, to set forth both facts and her opinions counseling against either a constitutional or discretionary disbursement of funds.  Thus, the court concludes that Defendant adequately supported her claim of conditional privilege and that Plaintiff failed to produce the necessary material facts to prove that the privilege was abused. Accordingly, Defendant is entitled to summary judgment on this ground.  *See Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996) (finding that Plaintiff failed to meet his burden to show abuse of privilege where complaint merely alleged an abuse of privilege in a series of legal conclusions and failed to demonstrate facts which would support a finding that the publication was a result of malice or improper purpose).

**IV.**         **Conclusion**

27

For the reasons set forth above, the court will grant Defendant's motion for summary judgment.  An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  June 12, 2014.